UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY SANDBERG,

    Plaintiff,                                  Hon. Robert J. Jonker

v.                                          Case No. 1:18-cv-426

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence

supporting that decision.  *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla, but less than a preponderance.  *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted).  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight.  *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 44 years of age on her alleged disability onset date.  (PageID.208). She successfully completed high school and worked previously as a cashier.  (PageID.70).

Plaintiff applied for benefits on July 7, 2014, alleging that she had been disabled since April 11, 2011, due to migraines, depression, anxiety, as well as the effects of an automobile accident. (PageID.208-13, 263). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (PageID.108-206). On January 24, 2017, Plaintiff appeared before ALJ Nicholas Ohanesian with testimony being offered by Plaintiff and a vocational expert. (PageID.78-107). In a written decision dated March 10, 2017, the ALJ determined that Plaintiff was disabled beginning December 17, 2016, but not prior thereto. (PageID.48-72). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.32-37). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision that she was not disabled during the closed period from April 11, 2011, through December 16, 2016.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) degenerative disc disease of the cervical spine status-post fusion; (2) degenerative disc disease of the lumbar spine status-post fusion; (3) degenerative joint disease of the shoulders; (4) chronic diarrhea; (5) obesity; (6) major depressive disorder; and (7) an anxiety disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.50-54).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1)

she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; (2) she can occasionally balance, stoop, kneel, crouch, crawl, and perform overhead reaching; (3) she can have frequent exposure to extreme cold, vibration, hazardous moving machinery, and unprotected heights; (4) she can receive, comprehend, and execute simple routine tasks; (5) she will be off-task five percent of the day in addition to regularly scheduled breaks on a regular and ongoing basis secondary to digestive tract issues.   (PageID.54).

The ALJ found that Plaintiff was unable to perform her past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding.   Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 132,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (PageID.100-03).   This represents a significant number of jobs.  *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed

'significant'"). The ALJ, therefore, found that Plaintiff was not entitled to disability benefits prior to December 17, 2016, the date on which she attained 50 years of age. However, once Plaintiff attained 50 years of age, the ALJ found that she was disabled pursuant to Rule 201.12 of the Medical-Vocational Guidelines. (PageID.70-72).

## I. Medical Evidence

The administrative record contained copies of Plaintiff's medical treatment records. The ALJ described this evidence as follows:

> In April 2011, following a motor vehicle accident, a CT scan of the cervical spine showed disc degeneration with spondylosis at the C5-C6 and C6- C7 levels, but was otherwise unremarkable (Ex. 7F/14; *See also* Ex. 12F/19). In April 2013, x-ray imaging revealed moderate to severe multilevel cervical degenerative disc disease (Ex. 13F/6). An MRI of the cervical spine showed multilevel degenerative spondylosis most advanced at the C5-C6 level with disc protrusion and paracentral herniation at the C5-C6 and C6-C7 levels, respectively, resulting in varying degrees of neural foraminal narrowing and mild spinal canal stenosis at the C6-C7 level (Ex. 5F/20 and 13F/5). In March 2014, an MRI of the cervical spine demonstrated degenerative changes with spondylosis and herniation of the C6-C7 disc with the herniation larger than it appeared in 2013 (Ex. 13F/4). In June 2014, a CT scan of the cervical spine showed postoperative changes; however, the study otherwise revealed generally unremarkable findings with hardware in good position and no evidence of spondylolisthesis (Ex. 5F/5 and 14).
>
> In October 2014, an MRI of the lumbar spine showed mild to moderately advanced discogenic degenerative changes most prominent at the lumbosacral junction with a far left lateral broad-based disc protrusion at the L4-L5 level (Ex. 4F/2). In February 2015, it was noted that x-rays showed fairly severe foraminal stenosis particularly at the LS-S1 level and severe degenerative changes at the L4-L5 and L5-S1 levels (Ex. 16F/5). In May 2015, x-ray imaging showed good position of the implants with incorporation of the graft (Ex. 16F/l). In October 2015, a CT scan revealed multilevel foraminal narrowing that was at least moderate on the right at the LS-S1 level; however, there was no hardware complication and no evidence of gross spinal stenosis (Ex. 20F/4-5). It was noted that the CT scan and x-rays showed a solid fusion (Ex. 22F/12 and 15). In January 2016, it was noted that x-rays

showed sclerosis at the sacroiliac joints; however, it was mild (Ex. 22F/10). In February 2016, a CT scan showed stable postoperative changes with asymmetric left lateral recess and left neural foraminal stenosis at the L3-L4 level resulting in mild effacement of the left L3 foraminal nerve root (Ex. 20F/2-3). It was subsequently noted the study showed solid arthrodesis (Ex. 22F/6). In May 2016, x-ray imaging showed postoperative changes with hardware in good position and no evidence of subluxation (Ex. 23F/3).

In April 2013, a CT scan revealed degenerative joint disease of the sternoclavicular and acromioclavicular joints of the right shoulder; however, these findings were noted to be mild (Ex.13F/7). In September 2014, an ultrasound demonstrated chronic subdeltoid bursitis of the left supraspinatus tendon; however, the findings were mild (Ex. 5F/26). An electromyogram of the left shoulder, performed in October 2014, was unremarkable (Ex. 5F/13). In July 2015, an MRI of the left shoulder revealed supraspinatus and infraspinatus tendinosis with mild to moderate acromioclavicular degenerative joint disease (Ex. 20F/6).

The objective examination findings do not support the extent of the claimant's alleged limitations. The claimant reported subjective pain during examinations, including with palpation, range of motion, diagnostic testing, and lifting her leg (Ex. 2F/7; 5F/13, 25; 7F/9; 16F/1; 19F/2; 22F/10, 14; and 24F/l; *See also* Ex. 12F; 14F; and 25F). During chiropractic evaluations between May 2011 and February 2015, she presented with findings including trigger points, decreased range of motion of the neck, abnormal alignment and posture, and muscle spasms and tightness with weakness noted in January 2014 (Ex. 3F; 12F; and 14F). During orthopedic evaluations, she has presented with positive impingement signs in the left shoulder (Ex. SF/25; 16F/4; and 22F/14-16). In July 2013, the claimant had limited cervical extension due to pain as well as reduced deep tendon reflexes (Ex. SF/12). In April 2014, she had decreased cervical range of motion with 4/5 right grip strength (Ex. 2F/7). At an orthopedic evaluation in September 2014, the claimant had a little weakness on empty can testing (Ex. 5F/25). In February 2015, during a functional capacity evaluation, the claimant demonstrated pain behaviors that were consistent with her report of pain and observed movement patterns (Ex. 25F/2). She had reduced cervical, lumbar, and shoulder range of motion with reduced upper and lower extremity strength with limitations also from deconditioning (Ex. 25F/2-5). The claimant's gait was noted to become slower and with a more pronounced limp by the end of the evaluation (Ex. 25F/5). In March and April 2015, it was noted she had decreased range of motion of the spine and neck with decreased

strength reported in March 2015 (Ex. 18F/2 and 19F/2). In June 2015, the claimant had a positive compression test and a mildly positive apprehension test with mild to moderate atrophy of her lumbar paraspinal muscles (Ex. 22F/16). In October 2015, she presented with a positive cross arm test; however, she had a negative cross arm test after an injection (Ex. 22F/14).

Despite the above noted findings, the claimant otherwise presented with unremarkable findings. In April 2011, the claimant presented with 5/5 strength in the upper and lower extremities with intact sensation (Ex. 7F/9; *See also* Ex. 7F/6). She did not have tenderness with palpation of the spine from the cervical spine to the coccyx (Ex. 7F/9). In June 2011, she did not appear to be in pain and she presented with a normal gait (Ex. 11F/8-11). In July 2011, she was ambulating appropriately and presented with no focal motor or sensory deficits (Ex. 11F/23). In September and October 2011, she had full range of motion of the neck (Ex. 11F/2 and 6). At that time, the claimant denied experiencing back pain, spasms, weakness, and decreased range of motion (Ex. 11F/2 and 6). At a functional capacity evaluation in September 2012, the claimant demonstrated self-limiting pain behavior on 50 percent of tasks with inconsistent pain behaviors (Ex. 25F/10). It was noted she also demonstrated function inconsistencies of scoring higher on trunk rotation sitting than on sitting and that she scored higher on the lift floor to waist than on bilateral carrying (Ex. 25F/10). It was observed she used awkward hand positions for lifting and moved more slowly than necessary for tasks, when moving more rapidly would be less difficult (Ex. 25F/11). The claimant took brief rest breaks; however, it was observed that she did not demonstrate signs of fatigue (Ex. 25F/11).

In July 2013, the claimant presented with nearly full cervical spine flexion as well as full strength in her upper extremities, with intact neurological findings observed in August 2013 and February 2014 (Ex. 5F/10-12). In April 2014, the claimant had intact reflexes with 5/5 grip strength in the left hand (Ex. 2F/7). She denied having muscle weakness and spasm (Ex. 2F/6). In April and May 2014, after surgery, the claimant was neurologically intact (Ex. 5F/7-8). In June, July, August, September, October, November, and December 2014, as well as in January 2015, it was noted her neck range of motion was improved (Ex. 3F/52-69 and 14F/16-91). In September 2014, she had a negative Spurling's sign with generally 5/5 strength in the upper extremities as well as intact reflexes (Ex. 5F/25-26). In October 2014, she had unremarkable neurological findings (Ex. 5F/4 and 13). During her psychological consultative evaluation in November 2014, the claimant was able to ambulate independently

and did not display a gait disturbance (Ex. 6F/2). She had intact neurological findings in December 2014 (Ex. 16F/8). In January, February, and March 2015, she had normal gait and station (Ex. 28F/3, 8, and 13). In February 2015, the claimant had full strength in the left upper extremity (Ex. 16F/4). She had intact neurological findings (Ex. 16F/5). In March 2015, the claimant had full strength, normal reflexes, and intact sensation with negative straight leg raise testing and no tenderness to palpation of the spine (Ex. 15F/13; *See also* Ex. 17F/2). In April and May 2015, as well as in October and December 2015, she had intact neurological findings (Ex. 16F/1-2 and 22F/12, 15; *See also* Ex. 16F/3). In January 2016, she had negative straight leg raising testing and non-focal findings on a motor examination (Ex. 22F/10). Upon evaluation in February and October 2016, the claimant had intact neurological findings (Ex. 22F/7 and 27F/1).

In April 2014, the claimant underwent a C6 corpectomy and an anterior cervical fusion from C5 to C7 in April 2014 (Ex. 13F/1-2 and 15F/3). In March 2015, she underwent bilateral facetectomies at the L4-L5 and L5-S1 levels with transforminal lumber interbody fusion at these levels and a posterolateral fusion at the L4-S1 levels, after which she was given a shower chair and a walker (Ex. 15F/8-11 and 17F/1). In April 2016, the claimant underwent placement of a spinal stimulator, which was removed in May 2016 due to infection (Ex. 21F/1 and 23F/1-2). However, a spinal stimulator was implanted again in October 2016 (Ex. 26F). The claimant participated in chiropractic adjustment, physical therapy, and steroid injections with use of medication noted (Ex. 3F; 5F; 12F; 14F; 15F-16F; and 22F).

Despite the claimant's allegations, the claimant presented with some improvement from treatment. During chiropractic notes from September 2011 and January 2012, it was noted she was improving with treatment (Ex. 12F/1 and 8). The claimant continued to report improvement with chiropractic treatment *(See* Ex. 3F/4, 19-71; and 14F/3-93). She also described having some improvement from medication (Ex. 3F/7-37). In August 2013, she noted she had improvement following a cervical epidural injection (Ex. 5F/11). In April and May 2014, the claimant reported some improvement following surgery, noting in October 2014 that her neck was much improved (Ex. SF/3-8). In November 2014, she reported 70 percent improvement following neck surgery with 80 percent improvement from injections in her left shoulder (Ex. 6F/1). During an evaluation in December 2014, she noted her neck was doing well (Ex. 16F/8). In February 2015, she stated she had prolonged response to a subacromial injection in the left shoulder (Ex. 16F/4). In March,

April, and May 2015, she noted she had some improvement following surgery on her lumbar spine (Ex. 16F/1-3). In June 2015, the claimant reported her low back was doing reasonably well (Ex. 22F/16). In October 2015, the claimant described improvement from a left shoulder injection (Ex. 22F/14). In March 2016, the claimant reported 80 percent relief of symptoms following a trial spinal stimulator, noting she was doing well (Ex. 22F/4; *See also* Ex. 21F/1-3). In April 2016, she noted the spinal stimulator was helping her (Ex. 22F/3). In October 2016, she noted she was getting coverage of her pain from her spinal stimulator (Ex. 27F/4). In November 2016, she stated she had good coverage of her sharp stabbing pain (Ex. 27F/1).

The medical evidence of record shows the claimant has some limitations from chronic diarrhea; however, the objective medical evidence of record does not support the extent of the claimant's alleged limitations. While hospitalized following a motor vehicle accident in April 2011, a CT scan of the chest, abdomen, and pelvis showed hemoperitoneum with ancillary findings suggesting source from the right lower quadrant mesentery with traumatic injury to the small bowel not excluded (Ex. 7F/6, 9, and 13). The claimant underwent open laparotomy and small bowel resection with appendectomy and drainage of the fat avulsion on the abdominal wall (Ex. 7F/3 and 19). The record indicates that approximately 20 centimeters of the small intestine were removed (Ex. 11F/20). Biopsy results showed acute ischemic injury to the ileum with necrosis consistent with poor perfusion due to avulsion of the mesentery from the small bowel and small bowel diverticulum consistent with Meckel's diverticular with mild acute serosal/subserosal inflammation (Ex. 7F/22). Subsequent to surgery, the claimant was diagnosed with chronic diarrhea, and she, at times, reported having active symptoms (Ex. 11F/7-14, 20-23; 12F/13-14; and 28F/7, 28F/12).

However, statements made to treating and evaluating sources do not support the extent of the claimant's limitations. In April 2011, the claimant reported her bowels were working normally (Ex. 8F/1). In June 2011, she denied having abdominal pain, constipation, nausea, and vomiting (Ex. 11F/8). In July 2011, she noted her bowel movement frequency had improved from eight times a day to five or six times a day (Ex. 11F/22). At that time, she denied having other gastrointestinal symptomology such as constipation, nausea, vomiting, melena, hematochezia, fevers, and chills (Ex. 11F/22). In October 2011, she indicated she had abdominal pain only once a week (Ex. 11F/20). In July 2013 and September 2014, as well as in

January 2016, she denied having nausea, vomiting, and bowel dysfunction (Ex. 5F/12, 25; and 22F/10).

Additionally, the objective medical evidence of record does not support the extent of the claimant's alleged limitations. At times, the claimant reported subjective tenderness with palpation of the abdomen (Ex. 11F/11 and 23). However, the claimant otherwise presented with unremarkable findings. In August 2011, a duplex study of the mesenteric artery showed no evidence of hemodynamically significant celiac disease and no pre-prandial or postprandial superior mesenteric artery stenosis (Ex. 11F/15). She had essentially negative findings on a CT scan as well as unremarkable laboratory findings (Ex. 11F/17-20). In October 2011, a small bowel follow-through study showed rapid transit; however, it was determined to be mild (Ex. 11F/19-20). During evaluations, the claimant presented without acute distress (Ex. 5F/12; 11F/14, 22; 15F/12; *See also* Ex. 11F/8-11). In June 2011, she had normal bowel sounds with no distention, guarding, dullness to percussion, or masses as well as no tenderness to palpation of the abdomen or left costovertebral angle (Ex. 11F/8-11). In July 2011, she had a soft abdomen and present bowel sounds without rebound, guarding, rigidity, or masses (Ex. 11F/22-23). In April 2014, the claimant had unremarkable findings upon examination of the abdomen (Ex. 2F/7). In March 2015, examination of the claimant's abdomen was benign (Ex. 15F/13).

Despite the claimant's history of surgery in April 2011, the record demonstrates subsequent treatment of her gastrointestinal symptoms was conservative. Specifically, the claimant has been prescribed medication (Ex. 11F/20 and Testimony). She has not otherwise required treatment for this condition, such as additional surgery.

The record establishes the claimant is obese. In October 2015, the claimant was five feet and six inches tall, weighing 215 pounds (Ex. 22F/14). Accordingly, she has a BMI of 34.9, which is within the range of obesity. Pursuant to the Regulations, I considered how weight affects the claimant's ability to perform routine movement and necessary physical activity within the work environment. I am aware obesity is a risk factor that increases an individual's likelihood of developing impairments in most body symptoms. Obesity can lead to limitation of function. The effects of obesity may not be obvious. The combined effects of obesity with other impairments may be greater than might be expected without the disorder. I considered any added or accumulative effects the claimant's obesity played on her ability to function, and to perform routine movement and necessary physical activity within the work environment.

The claimant has some limitations from major depressive disorder and an anxiety disorder; however, the objective medical evidence of record does not support the extent of the claimant's alleged limitations. The claimant reported symptoms including stress, frustration, excessive crying, irritability, racing thoughts, nightmares, and poor self-esteem, indicating in January 2015 that she had passive suicidal ideation (Ex. 6F/3; 11F/22; 12F/9, 13; 28F/2, 7, 11-12). She has been diagnosed with major depressive disorder and an anxiety disorder (Ex. 6F/4; *See also* 11F/12 and 23). Although the claimant reported passive suicidal thoughts in January 2015, there is no evidence of ongoing suicidal ideation, homicidal ideation, psychosis, panic attacks, or other severe symptomatology (Ex. 28F/11l; *See also, generally,* Ex. IF-29F).

The objective examination findings do not support the extent of the claimant's alleged limitations. In November 2014, during a consultative evaluation, the claimant was briefly tearful (Ex. 6F/3). In February 2015, during a functional capacity evaluation, the claimant appeared emotional (Ex. 25F/2). In January 2016, she appeared tearful during an orthopedic evaluation after she was advised that her pain medication would not be adjusted (Ex. 22F/10).

However, the claimant otherwise presented with unremarkable findings. During evaluations, she had appropriate dress and grooming (Ex. 2F/6; 11F/2, 6, 14; and 28F/2-13). She has appeared cooperative, pleasant, and/or friendly (Ex. 2F/6; 6F/3; 11F/2, 6, 22; and 28F/2-13). Upon evaluation in June 2011, she had an appropriate mood and affect (Ex. 11F/8-11). In September 2014, it was noted she had no cardinal signs of pressure or anxiety (Ex. SF/26). In November 2014, the claimant maintained good eye contact (Ex. 6F/3). She was able to express herself in a clear, logical, and organized manner, appearing spontaneous with rapport easily established (Ex. 6F/3). She was able to focus and concentrate during the evaluation (Ex. 6F/3). She was able to recall three of three items after a three-minute delay, name the four former presidents that are still living, and recall six digits forward and five backward (Ex. 6F/3). Although she made one error on serial seven subtractions as well an error when solving a calculation requiring multiplication, she was otherwise able to add, subtract, and multiply as well as spell the word "world" backward and forward (Ex. 6F/4). In January, February, and March 2015, the claimant had good eye contact, normal psychomotor activity, normal speech, a euthymic mood, a normal affect, intact thought processes, normal thought content, intact insight and judgment, and intact attention, concentration, and recent and remote memory (Ex. 28F/2-3, 8, and 13).

> The medical evidence of record demonstrates generally conservative treatment for the claimant's mental impairments. The claimant has been prescribed medication for depression and anxiety (Ex. 11F; 15F; and 28F). In June 2011, she indicated she had attended one counseling session (Ex. 11F/12). The record shows she participated in behavioral health services from January to March 2015 (Ex. 28F). There is no indication of any inpatient treatment, ongoing counseling, emergency room visits, intensive case management, partial hospitalizations, or hospitalizations for her mental impairments. The record also demonstrates some improvement with treatment. For example, in March 2015, the claimant stated she had improved sleep from use of Elavil (Ex. 28F/1). It was assessed her symptoms were improving (Ex. 28F/4). Her medication was continued (Ex. 28F/5).
>
> I considered the claimant's reported medication side effects and complications from treatment. In January 2015, the claimant denied having medication side effects (Ex. 28F/12). In February 2015, she stated she had a rash from Lamictal, which was discontinued; however, she otherwise denied having medication side effects (Ex. 28F/6-7). In March 2015, she denied side effects from her current medication (Ex. 28F/1-2). In March 2015, in a medical source statement, it was noted she had no side effects (Ex. 18F/2). In an April 2015 medical source statement, it was reported she experienced drowsiness (Ex. 19F/2). However, treatment records from at or around that period do not demonstrate that she reported having drowsiness from medication (Ex. l5F-l7F; 25F; and 28F). In April and May 2016, after placement of a spinal stimulator, the claimant developed a wound infection and her spinal stimulator was removed; however, the record demonstrates the claimant's infection improved and that a new spinal stimulator was implanted in October 2016 (Ex. 22F/1-3; 23F/1-2; 24F/1-3; and 26F/1-2).

(PageID.55-61).

### III.     Medical Opinion Evidence

As discussed below, several of Plaintiff's care providers, as well as Plaintiff's mother, offered opinions regarding Plaintiff's ability to function. To the extent these opinions articulated limitations greater than reflected in the ALJ's RFC assessment, the ALJ afforded such only limited weight. Plaintiff argues that she is entitled to relief because the ALJ's rationale for discounting the opinion in question is not supported by substantial evidence.

A.      Treating Physicians Dr. Eyke and Dr. Kapetyn[2]

On December 30, 2016, Dr. Eyke reported that Plaintiff was limited to working "4 days a week for 6 hours per day." (PageID.785). On September 10, 2014, Dr. Kapetyn reported that Plaintiff "appears to be continued off work here for her neck issues." (PageID.461). The doctor also reported that Plaintiff experienced "impaired lifting in the left upper extremity." (PageID.461). The ALJ afforded "little weight" to these opinions. (PageID.67-68).

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human*

---

[2] Plaintiff has failed to identify the opinions which form the basis for these claims. Accordingly, the Court will simply assess the opinions identified and evaluated by the ALJ.

*Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ considers the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

With respect to Dr. Eyke's December 2016 opinion that Plaintiff was limited to working "4 days a week for 6 hours per day," the ALJ noted that such was inconsistent with the medical record which demonstrated "frequently unremarkable neurological findings and improvement with treatment." (PageID.67). The ALJ also observed that only one month prior, Dr. Eyke reported that Plaintiff could return to work without restriction.[3] (PageID.766). As for Dr. Kapetyn's opinion that Plaintiff "appears to" be unable to work and experiences "impaired lifting in the left upper extremity," the ALJ rejected the former as a matter reserved to the Commissioner and the latter as vague and unsupported by the evidence. (PageID.68). In sum, substantial evidence supports the ALJ's decision to discount the opinions in question. Accordingly, this argument is rejected.

B.   Other Sources

Plaintiff objects to the ALJ's assessment of the opinions of Physician's Assistant Smit and Occupational Therapist Boersma. While these individuals are not considered acceptable medical sources, they are nevertheless permitted to offer statements regarding "the severity of [a claimant's] impairment(s) and how [such] affects [her] ability to work." *See*, *e.g.*, 20 C.F.R. §§ 404.1513(d); 416.913(d). While such statements can never be afforded controlling weight, the ALJ must evaluate such by reference to the factors identified above. *See*, *e.g.*, *Gayheart*, 710 F.3d at 378 ("[t]he factors set forth in 20 C.F.R. § 404.1527. . .represent basic principles that apply to the consideration of all opinions from medical sources. . .who have seen the individual in their

---

[3] Dr. Eyke offered other opinions that Plaintiff was more limited than the ALJ concluded. (PageID.688, 768). Plaintiff, however, has neither cited to nor discussed these particular opinions. Moreover, as the ALJ observed, these particular opinions were articulated "immediately after surgery and do not appear to have been intended to be permanent." (PageID.68).

professional capacity"). Plaintiff also objects to the ALJ's assessment of opinions offered by her mother.

1. PA Smit

On March 17, 2015, Smit reported that during an 8-hour workday, Plaintiff could sit and stand/walk for less than 2 hours each and required "unscheduled breaks" of 30 minutes duration. (PageID.694-95). Smit also reported that Plaintiff was unable to walk more than one-half city block. (PageID.694). On April 1, 2015, Smit reported that Plaintiff would be "off task" twenty (20) percent of the workday impairing her ability to perform "even simple work tasks." (PageID.710).

In support of his decision to afford limited weight to Smit's opinion, the ALJ noted that Smit's "assessment of the claimant's exertional abilities is not consistent with the weight of the medical evidence of record, including objective examination findings, diagnostic imaging and testing, and the longitudinal treatment record." (PageID.66-67). The ALJ also noted that Plaintiff "often presented with unremarkable neurological findings and she has experienced and reported improvement with treatment." (PageID.67). Finally, the ALJ observed that the limitations in question "are not consistent with the claimant's activities of daily living, including her ability to work part-time." (PageID.67). Because the ALJ's rationale is supported by substantial evidence, this argument is rejected.

2. Occupational Therapist Boersma

In September 2012, Boersma reported that Plaintiff's "minimal overall level of work falls within the sedentary range." (PageID.752). As the ALJ observed, Boersma's assessment represents her opinion as to Plaintiff's "minimum ability." (PageID.65). The ALJ's RFC assessment, however, represents the "most [Plaintiff] can still do despite [her] limitations."

*Sullivan v. Commissioner of Social Security*, 595 Fed. Appx. 502, 505 (6th Cir., Dec. 12, 2014). Thus, Boersma has failed to even articulate an opinion which is inconsistent with the ALJ's RFC assessment. Furthermore, as the ALJ noted, Boersma examined Plaintiff "on only one occasion, which was prior to [Plaintiff's] spinal surgeries." (PageID.65). The ALJ's rationale is supported by substantial evidence. Accordingly, this argument is rejected.

3.   Plaintiff's Mother

Plaintiff's mother completed a function report in which she asserted that Plaintiff is significantly more limited than the ALJ recognized. (PAgeID.271-78). The ALJ properly credited these opinions only to the extent they were supported by the medical evidence. *See, e.g., Mullins v. Commissioner of Social Security*, 2015 WL 3441163 at *13 (E.D. Mich., May 28, 2015) ("the ALJ is not required to give any perceptible weight to lay opinion testimony that does not comport with the medical evidence"). Accordingly, this argument is rejected.

## CONCLUSION

For the reasons stated herein, the undersigned recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: December 18, 2018

 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge